**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MONIQUE A. MARSHALL,**

                **Plaintiff,**                **1:12-cv-14**
                                                  **(GLS/CFH)**

                  v.

**NEW YORK STATE OFFICE OF**
**TEMPORARY AND DISABILITY**
**ASSISTANCE,**

                  **Defendant.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Monique A. Marshall
Pro Se
425 Second Avenue
Albany, NY 12209

**FOR THE DEFENDANT:**
HON. ERIC T. SCHNEIDERMAN     CATHY Y. SHEEHAN
New York State Attorney General      Assistant Attorney General
The Capitol
Albany, NY 12224

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff *pro se* Monique A. Marshall commenced this action against

defendant New York State Office of Temporary and Disability Assistance (OTDA), alleging violations of Title VII of the Civil Rights Act of 1964[1] based on race and/or national origin. (*See generally* Am. Compl., Dkt. No. 19.) Pending before the court is OTDA's motion for summary judgment. (Dkt. No. 41.) For the reasons that follow, the motion is granted.

## II. **Background**[2]

In April 2006, Marshall, an African-American female of Guyanese descent, (Am. Compl. at 1; Dkt. No. 41, Attach. 7 at 140), was hired by OTDA as a Housing Specialist I, a grade eighteen position. (Def.'s Statement of Material Facts (SMF) ¶ 1, Dkt. No. 41, Attach. 2.) In May 2008, Marshall's direct supervisor, Caroline Wilcox, retired, resulting in her workload being redistributed among Marshall and the other employees in her unit "based on program experience." (*Id.* ¶¶ 4-5.) In order to assist Marshall with her new assignments, she was provided with additional resources, including interns to help her complete the work, as well as other staff members completing some of her original responsibilities. (*Id.* ¶¶ 8, 10.)

---

[1] *See* 42 U.S.C. §§ 2000e–2000e-17.

[2] Unless otherwise noted, the facts are not in dispute.

2

Beginning in early August 2009, Marshall expressed concerns to her supervisors about her continued ability to complete her workload, because an intern assigned to her had completed his/her internship. (*Id.* ¶ 12.) A meeting was set up for the following week with Richard Umholtz, the unit supervisor. (*Id.* ¶ 13.) In the meantime, on August 12, Marshall sent a memorandum to OTDA's Bureau of Equal Opportunity Development (EOD) regarding her workload. (*Id.* ¶ 14; Dkt. No. 41, Attach. 5 ¶ 3.) Marshall subsequently met with Umholtz, Scott Edwards, Director of the Bureau of Housing and Support Services, Andrea Collins, Marshall's supervisor at the time, and Lester Freeman, OTDA's EOD Director, to discuss her concerns. (Def.'s SMF ¶¶ 17-19; Dkt. No. 50 at 11-13.) Following that meeting, Edwards issued a memorandum, dated August 25, in which he confirmed meeting with Marshall on August 19, and made "recommendations to alleviate [her] concerns regarding her work-load." (Def.'s SMF ¶¶ 19-20; Dkt. No. 41, Attach. 4 at 15-16.) Specifically, Edwards noted that, during the meeting, "Marshall re-stated her concerns regarding her workload" and her feelings that she was given "an excessive assignment both in quantity and comparatively to other programs administered by the unit." (Dkt. No. 41, Attach. 4 at 15.) As a result, several "duties were immediately relieved

from . . . Marshall" pursuant to her "request for re-assignment" and in order

"[t]o reduce the anxiety . . . Marshall has expressed regarding the level of

work required."  (*Id.* at 15-16.)

Around this same time, OTDA was in the process of making personnel changes, specifically, promoting four employees—David Szary, Andrea Collins, Dana Greenberg, and Barbara Roff, who were all at the time serving as a Housing Specialist II in a provisional capacity—to permanent roles under that title.  (Def.'s SMF ¶¶ 28, 32.)  These appointments occurred after a civil service exam had been conducted, in January 2009, for Housing Specialist II, a grade twenty-three position.  (*Id.* ¶ 31.)  Marshall scored a seventy-five on the exam; all of the individuals who were ultimately permanently appointed scored higher than Marshall, except for Greenberg, who recorded the same score as Marshall.  (Dkt. No. 41, Attach. 6 at 47-49.)

On August 31, 2009, Marshall filed a formal complaint with EOD, by way of an email to Freeman, indicating her belief that her workload was increased and she was passed over for the promotion to Housing Specialist II, both because of her race/national origin, and out of retaliation for her earlier complaints.  (Dkt. No. 50 at 20-25.)  Although she no longer

4

serves as a Housing Specialist, Marshall is still employed with OTDA as a Temporary Assistant Specialist I. (Def.'s SMF ¶¶ 36-38.)

### III. Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV. Discussion

Marshall alleges that OTDA's decisions to increase her workload and to decline to promote her to Housing Specialist II were made on the basis of her race and/or national origin, in violation of Title VII. (Am. Compl. at 1, ¶ 36.) She further appears to allege that OTDA also had a retaliatory motive for these decisions, and took action against her because she had complained of unfair treatment. (*Id.* ¶ 19.) In its motion, OTDA argues that it is entitled to summary judgment on Marshall's discrimination claim because the undisputed facts do not raise an inference of unlawful discrimination, OTDA's decisions with respect to Marshall were based on legitimate, nondiscriminatory reasons, and Marshall has failed to produce

any evidence that the stated reasons for OTDA's decisions were a pretext for discrimination. (Dkt. No. 41, Attach. 8 at 1-9.) OTDA further argues that no retaliation claim is cognizable here because Marshall did not engage in any protected activity until after the allegedly retaliatory actions were taken. (*Id.* at 9-10.) In response, Marshall has submitted a memorandum, citing no legal authority and containing only occasional citations to the factual record, in which she argues, in conclusory fashion, that OTDA's actions were motivated by her race and/or national origin, and were taken in retaliation for her complaints to EOD. (Dkt. No. 48 at 1-9.) After considering each of Marshall's claims below, the court agrees with OTDA, and its motion is therefore granted.

**A.    Discrimination**

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting rules, which place upon the plaintiff the initial burden of making out

6

a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To satisfy this initial burden, the plaintiff "'must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations omitted). If the defendant comes forward with a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Ultimately, once the burden shifts back to the plaintiff, she must show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb*, 521 F.3d at 138. The plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As further explained by the Supreme Court, to demonstrate pretext, a plaintiff must show "*both* that the [employer's offered] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir. 1995). However, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Holcomb*, 521 F.3d at 137; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

Here, assuming, without deciding, that Marshall has established a prima facie case of discrimination, it is clear that defendants had legitimate, nondiscriminatory reasons for increasing her workload and declining to promote her to Housing Specialist II, the two actions of which Marshall complains here—namely, that her supervisor retired, necessitating a

8

redistribution of work assignments among the staff, and that those who were already serving in the role of Housing Specialist II on a provisional basis were simply appointed permanently. (Def.'s SMF ¶¶ 4-5, 25, 28-30, 32-33; Dkt. No. 41, Attach. 4 ¶¶ 10-13.) Specifically, Wilcox's retirement required several members of the Bureau of Housing and Support Services to assume additional responsibilities. (Dkt. No. 41, Attach. 4 ¶¶ 10-12.) With respect to the promotion, OTDA indicates that the four employees appointed permanently as Housing Specialist II had already been serving in that role in a provisional capacity, (*id.* ¶ 30), and interviews were not conducted because the provisional appointees' scores on the civil service exam made them "reachable" for the position; thus, they were the ones selected. (*Id.*; Dkt. No. 41, Attach. 5 ¶ 15.) OTDA has also indicated that to hire or promote anyone other than a provisional Housing Specialist II to that position would have required it to go through a budgetary approval process that was unlikely to be successful. (Dkt. No. 41, Attach. 4 ¶ 29; Dkt. No. 41, Attach. 5 ¶ 16.)

    Accordingly, the burden rests with Marshall to demonstrate, with record evidence support, that OTDA's stated bases for these actions were pretextual, and that the actions taken against her were actually motivated

9

by her race and/or national origin. *See Holcomb*, 521 F.3d at 138. Marshall has failed to do that here. In fact, in its earlier decision denying OTDA's motion to dismiss, the court advised Marshall of this potential flaw in her claims, stressing that she "should take note of the arguments OTDA raises in its motion papers, specifically regarding the nexus between her protected characteristics and the alleged misconduct." (Dkt. No. 28 at 6 n.5.)

      The only record evidence even arguably implicating Marshall's race and/or national origin as relevant to her employer is her testimony regarding one comment Edwards made in the course of a conversation with Marshall in September 2008 about an intern who had not been working the hours to which he had committed. (Dkt. No. 41, Attach. 7 at 84-87.) According to Marshall, Edwards commented that she should be "used to working two or three jobs" because her family was from the Caribbean. (*Id.* at 86.) Aside from this isolated comment, made in a context entirely unrelated to Marshall's own work situation, when asked why she felt she was given extra tasks because of her race, she responded, "this is just my assumption." (*Id.* at 105-06.) Such "self-serving and conclusory statements made at [a] deposition . . . are insufficient to

avoid summary judgment on an issue as to which the nonmovant bears the ultimate burden of proof." *Lee v. ITT Standard*, 268 F. Supp. 2d 315, 354 (W.D.N.Y. 2002) (citing *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).

Marshall has critically failed to come forth with any evidence[3] that OTDA's actions were based on her race or a discriminatory animus. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (finding that a plaintiff must rebut evidence of legitimate, nondiscriminatory reasons for dismissal with specific evidence tending to show not only that those reasons were a pretext, but that unlawful discrimination was the real reason for the employment decision). It is well settled that "'conclusory allegations or unsubstantiated speculation' [are in]sufficient to raise a triable issue of fact as to whether . . . discriminatory animus" played a role in an adverse employment action. *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 (2d Cir. 2012) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)); *see Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (finding "purely speculative" assertions of discriminatory

---

[3] The court notes that Marshall's response to OTDA's motion is rife with references to "facts" that either contain no citation to any record evidence in support, or simply refer back to allegations in her amended complaint. (*See, e.g.*, Dkt. No. 50 at 4-9.)

11

animus insufficient to defeat summary judgment).

Notably, upon Marshall conveying her concerns about her workload, her superiors provided her additional resources such as an intern and other employees to assist her with completing tasks. (Dkt. No. 41, Attach. 4 ¶¶ 11, 15, 18.) Additionally, after meeting with supervisors and expressing her "concerns regarding her workload," she "was relieved of many duties" in order to reduce her stress and anxiety. (Dkt. No. 50 at 32-33.) Marshall's speculation and assumption that she was initially given additional tasks because of her race and/or national origin is simply not supported by the record before the court. Similarly, there is no evidence that OTDA's stated reasons for its promotion decision were false, or that her race or national origin played any role in that decision. OTDA's motion for summary judgment on Marshall's discrimination claim is therefore granted.

**B.  Retaliation**

With respect to Marshall's retaliation claim, OTDA argues that it is entitled to summary judgment dismissing this claim because the allegedly adverse employment actions which Marshall asserts were retaliatory—her increased workload and OTDA's refusal to promote her—all occurred prior

to Marshall communicating her concerns of unfair treatment due to her race and/or national origin. (Dkt. No. 41, Attach. 8 at 9-10.) The court agrees, and, accordingly, grants summary judgment to OTDA on Marshall's retaliation claim.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [that employee] has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001).

For a plaintiff's actions to constitute a protected activity, she must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Id.* at 283 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.

13

1988)). However, complaints about "just any law" do not suffice; the plaintiff must "have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks and citation omitted).

"Mere complaints of unfair treatment . . . are not protected speech under Title VII." *McNutt v. Nasca*, No. 1:10-CV-1301, 2013 WL 209469, at *16 (N.D.N.Y. Jan. 17, 2013) (internal quotation marks and citation omitted). In other words, the speaker must make clear to the employer that she is complaining of unfair treatment due to her membership in a protected class and that she is not complaining merely of unfair treatment generally. *See Dinice-Allen v. Yale-New Haven Hosp.*, No. 3:06CV00675, 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008). "While [a] plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 309 (S.D.N.Y. 2009); *see Woods v. N.M.C. Labs.,* No. 93-CV-2908, 1997 WL 1038873, at *2 (E.D.N.Y. July 14, 1997), *aff'd*, 162 F.3d 1149 (2d Cir. 1998). Similarly, "'[a]s to the second element [of the *prima facie* case],

implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.'" *Kelly*, 716 F.3d at 15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Here, the acts which Marshall alleges were taken in retaliation for her complaints consist of her increased workload and OTDA's decision to not promote her to the Housing Specialist II position. (*See generally* Am. Compl.) It is clear that Marshall's increased workload was precipitated by the retirement of her supervisor in May 2008. (Def.'s SMF ¶ 4-5; Dkt. No. 41, Attach. 4 ¶¶ 10-11.) As for the failure to promote, this process began in July 2009, when a list of qualified candidates for the position was created. (Dkt. No. 41, Attach. 4 ¶ 29.) At some point after that, the four provisional Housing Specialist II employees were appointed permanently to the position, effective August 20, 2009. (*Id.* ¶ 30.) Therefore, in order to maintain her retaliation claim, Marshall would have to demonstrate that she made complaints of unlawful discrimination based on her race and/or national origin at some point prior to these acts taking place.

Marshall alleges that "[t]hree complaints were filed formally with EOD

for discrimination and [r]etaliation (August 17th, August 31st and September 9th—all of 2009)." (Am. Compl. ¶ 13.) However, upon review of the records submitted by Marshall in opposition to this motion, it appears as though the earliest documentation of even an informal complaint communicated by her is an August 19, 2009 email to Freeman, in which she recaps a meeting attended by Marshall, Freeman, Edwards, Umholtz, and Collins. (Dkt. No. 50 at 11-13.) Based on Marshall's own "minutes" of that meeting, it is clear that she had concerns about her workload, but nowhere does she even imply her belief that this had occurred because of her race or national origin. (*Id.*) She simply states that "[i]t is the work that is overwhelming." (*Id.* at 12.) Marshall has provided a similar email of the same date, that she had sent to Umholtz about her "workload concerns," which is equally devoid of any references to a protected characteristic. (*Id.* at 13.)

Also included in the record is Edwards' memorandum, dated August 25, 2009, discussing the meeting he had with Marshall. (Dkt. No. 41, Attach. 4 at 15-16.) Again, nowhere in that document does it indicate that Marshall complained of discrimination based on any protected characteristic; instead, Edwards recounts Marshall's concerns about the

16

overwhelming nature of her workload, and noted that this issue would be addressed by redistributing some of Marshall's responsibilities. (*Id.* at 15.) Lastly, Marshall has provided an email to Freeman, dated August 28, 2009, in which she conveys her intent to file "[a] formal complaint regarding retaliation, bias, and unfair treatment," but in her "[r]easons for [the] complaint," she merely references her belief that her workload was "disproportionate." (Dkt. No. 50 at 34.)

In fact, when asked at her deposition, Marshall herself indicated that she told Umholtz that she had contacted EOD because she "felt that they were treating [her] unfair[ly]." (Dkt. No. 41, Attach. 7 at 57.) Similarly, Marshall claimed that she verbally complained to Edwards in December 2008, but stated that her "exact words" were that she "was feeling extremely overwhelmed and . . . felt [she] was being treated unfairly," with no mention of race or national origin. (*Id.* at 109.)

The first mention that Marshall made of any of these issues potentially being motivated by her race or national origin is found in a complaint she filed with EOD, dated August 31, 2009, which is prefaced by her explanation that she is filing an "updated complaint, which has the [bases] for the complaint indicated." (Dkt. No. 50 at 20.) In that complaint,

17

Marshall asks, "Why does it appear that minorities, persons of color are excluded from provisional opportunities?" and states her "belie[f] that [she] was discriminated against and . . . that factors of race, ethnicity and gender" factored into OTDA's decisions. (Dkt. No. 50 at 20-22.) However, this complaint occurred after her workload had already been increased, and after the promotion decisions had been made, as noted above. In sum, in response to OTDA's motion, Marshall has not pointed to any record evidence, beyond her mere allegations, demonstrating that at any time prior to her August 31 complaint, in which she finally included the "[bases] for the complaint", (Dkt. No. 50 at 20), her complaints to supervisors and EOD constituted anything more than her concerns about unfair treatment generally. Such complaints do not constitute protected activity under Title VII, *see Dinice-Allen*, 2008 WL 160206, at *4 ("Conduct described as discriminatory, without specificity does not qualify it as protected activity."), and would not serve to put her employer on notice of conduct prohibited by Title VII, *see Kelly*, 716 F.3d at 15. *See Lehman v. Bergmann Assocs., Inc.*, No. 13-CV-482S, 2014 WL 1315385, at *6 (W.D.N.Y. Mar. 31, 2014) (noting that, for a retaliation claim, a plaintiff must establish "that she complained . . . that she was being discriminated against *because of her*

18

[protected characteristic]" (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).

Instead, Marshall merely cites back to allegations made in her amended complaint, and asks the court to "[a]ssum[e] that [her] allegations are true." (Dkt. No. 48 at 4-7.) While her allegations alone were sufficient to survive a motion to dismiss, they do not suffice to defeat OTDA's summary judgment motion. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." (internal quotation marks and citation omitted)). Accordingly, OTDA's motion is granted.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that OTDA's motion for summary judgment (Dkt. No. 41) is **GRANTED**; and it is further

**ORDERED** that Marshall's amended complaint (Dkt. No. 19) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

19

Decision and Order to the parties.

**IT IS SO ORDERED.**

November 19, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court